UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WISCONSIN

CYNTHIA PECHANACH,

        Plaintiff,

        v.                         Case No. 06-C-1096

M & I BANK,

        Defendant.

## DECISION AND ORDER GRANTING MOTION FOR SUMMARY JUDGMENT (DOC. # 21) AND DISMISSING CASE

Cynthia Pechanach asserts that M&I Bank violated the Age Discrimination in Employment Act (ADEA) when it gave her four options regarding her employment position and then terminated her employment when she chose not to accept any of them. M&I moves for summary judgment.

Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of demonstrating it is entitled to summary judgment. *Celotex*, 477 U.S. at 323. If that burden is met, the nonmoving party must designate specific facts to support or defend each element of its cause of action, showing a genuine issue for trial. *Id.* at 322-24.

The mere existence of a factual dispute does not defeat a summary judgment motion; there must be a genuine issue of material fact for the case to survive. *Id.* at 247-48. "Material" means that the factual dispute must be outcome-determinative under

governing law. *Contreras v. City of Chicago*, 119 F.3d 1286, 1291 (7th Cir. 1997). Failure to support any essential element of a claim renders all other facts immaterial. *Celotex*, 477 U.S. at 323. To establish that a question of fact is "genuine," the nonmoving party must present specific and sufficient evidence that, if believed by a jury, would support a verdict in her favor. Fed. R. Civ. P. 56(e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The court construes the evidence in the light most favorable to the party opposing the motion. *Anderson*, 477 U.S. at 255.

## UNDISPUTED FACTS

The court must address a few matters before setting forth the facts. First, in considering the parties' proposed findings of fact the court has disregarded M&I's reply to Pechanach's response to M&I's proposed findings of fact. Such a reply is not contemplated by Civil L.R. 56.2(c). (The court is applying the version of the local rules applicable to cases and filings before February 1, 2010, as those rules were in effect when these documents were filed. The rules have since been amended and renumbered.)

Next, to several of M&I's proposed findings of fact Pechanach responded that they were "incomplete" and then added additional facts. Also, some objections include the assertion of additional facts. The place for additional facts was in Pechanach's proposed findings, not in her response to M&I's proposed findings. An "incomplete" proposed finding is not refuted by the addition of other facts unless the incomplete proposed finding was misleading as written. Therefore, any responses of "incomplete" and additional facts asserted in the responses have been disregarded.

To the extent that Pechanach objected to an M&I proposed finding on the basis of relevance, the objection is overruled if the proposed finding is included below.

2

Finally, the court must address Pechanach's stenopad and typewritten notes, which she cites as evidence in her proposed findings and in response to M&I's proposed findings. While she managed M&I's Loan Document Department at its Brookfield location, Pechanach made handwritten notes within a day or two of an event at work. (*See* Pl.'s Proposed Findings of Fact ("PPFOF") ¶¶ 24, 25; Ploor Aff. Ex. A at 18, 232-40; Rettko Aff. Ex. 1036.) After she was terminated in March 2006, Pechanach typed her notes, which had partially been written in her own method of shorthand. (*See* PPFOF ¶ 26; Ploor Aff. Ex. A at 18-23; Rettko Aff. Ex. 1001.) M&I objects to consideration of either form of notes, which are Exhibits 1001 and 1036.

M&I contends that neither exhibit is properly authenticated, as each was submitted under the affidavit of Pechanach's attorney rather than Pechanach, and there is no indication that the attorney had personal knowledge of the information in the documents. (Def.'s Reply Br. at 14-15.) Regardless, both exhibits were authenticated by Pechanach's deposition testimony, which her attorney references. Counsel's affidavit states merely that the submitted exhibits are true and accurate copies of the typed notes and notebook that Pechanach identified at certain transcript pages in her depositions of October 27, 2007, and November 8, 2007. (Rettko Aff. ¶¶ 11, 13.[1]) At pages 17 through 23 of the October deposition Pechanach identifies Exhibit 1001 as her typed transcription of the handwritten notes she made in stenopads during her employment. She indicates that the typed transcription was created on March 13 or 14, 2006, and that other than the expansion of her shorthand, the typewritten version is the same as the notes.

---

[1]The reference to a deposition of October 27 appears to be a typographical error, as the deposition transcript attached to defense counsel's affidavit indicates that the date was October 23.

3

This testimony by Pechanach is sufficient to authenticate the document. Pechanach identified Exhibit 1001, and Attorney Rettko confirmed that the copy attached to his affidavit was the same as that identified by Pechanach in her deposition.

Likewise, deposition pages describe the stenopad, handwritten notes Pechanach took during her employment. Further, the handwritten notes were marked as Exhibit 1036 and identified by Pechanach at pages 232 through 237 of her November deposition transcript. Her deposition testimony described the notes in Exhibit 1036, as well as when she made them, and Rettko's affidavit confirms that the copy submitted to the court is a true and accurate copy of the notebook identified at the deposition at pages 232 through 237. Therefore, the handwritten notes in Exhibit 1036 are sufficiently authenticated.

However, in addition, M&I objects to admission of the typed notes, Exhibit 1001, as violative of the best evidence rule. Federal Rule of Evidence 1002 states that to prove the content of a writing the original is required except as otherwise provided by the rules of evidence. It appears that Exhibit 1001 is a duplicate of Pechanach's notes and could not *replace* Exhibit 1036. However, like a transcription of a recorded conversation, the typewritten version could be used as an aid to deciphering Pechanach's handwriting or shorthand in the handwritten notes. Such transcriptions often are marked as exhibits even if not submitted to the jury. *See United States v. Berry*, 64 F.3d 305, 307 n.1 (7th Cir. 1995). As Exhibit 1036 is otherwise in evidence and questions as to what the handwritten notes say or differences between the handwriting and transcription have not been raised by the parties, it does not appear that Exhibit 1001 adds much, but neither does it cause

4

harm if admitted. For now, the court will consider Exhibit 1001, but the inclusion as evidence makes no difference to the outcome of the summary judgment motion.

Finally, M&I contends that the court should disregard citations to Exhibit 1036 that do not include a page reference, because the exhibit is 120 pages long and the court is not required to scour the record looking for a party's facts. While the legal proposition is correct, *see Hunt-Golliday v. Metro. Water Reclamation Dist.*, 104 F.3d 1004, 1010 n.2 (7th Cir. 1997) ("The parties bear the burden of identifying evidence that will facilitate the court in determining whether a material issue of fact exists. We have repeatedly indicated that we and the courts below are not obliged to scour the record looking for factual disputes."), here, the references to Exhibit 1036 usually are made in relation to events on particular dates or in a general date range, and Exhibit 1036 is marked with date entries. Thus, although Pechanach's counsel should have cited the exhibit's pages with more specificity, in this instance it is not difficult to find the references. Consequently, M&I's objections to proposed findings of fact that rely on Exhibit 1036 are overruled.

Turning to the facts, the following are either undisputed or taken in the light most favorable to Pechanach.

M&I (actual name M&I Marshall & Ilsley Bank) provides a variety of banking services to individuals and businesses throughout the country. (Def.'s Proposed Findings of Fact ("DPFOF") ¶ 3.[2]) Cynthia Pechanach, who is now sixty-one years old, was hired by M&I on September 22, 1976, as a Credit Specialist in its Credit Department. (DPFOF

---

[2]Generally, if the court cites only a proposed finding of fact, such proposed finding was admitted by the opposing party. *See* Civil L.R. 56.2(e).

¶¶ 4, 5.) Pechanach was continuously employed by M&I from that date until March 13, 2006. (PPFOF ¶ 2.)

Throughout her tenure at M&I, Pechanach was transferred and promoted. (DPFOF ¶ 6.) In 2000, she became manager of the Loan Documentation Department in M&I's Brookfield, Wisconsin, Regional Credit Center ("RCC"). (DPFOF ¶ 7.) Pechanach held this position until her termination. (PPFOF ¶ 3.) Her responsibilities included: ensuring that documents for all business loans were prepared accurately, ensuring loan documents were prepared on time, managing her staff to ensure high levels of customer service, preparing monthly productivity and quality reports, addressing internal issues, and finding and implementing procedural improvements. (DPFOF ¶ 15.) As of March 2006, Pechanach supervised approximately twenty individuals. (DPFOF ¶¶ 25, 26.) The "customers" of her department were internal M&I bankers who worked on loans with M&I's external customers. (DPFOF ¶ 16.) In general, RCCs are responsible for providing centralized credit administration and documentation support for all of M&I's commercial credit and agricultural relationships. (DPFOF ¶ 20.)

During Pechanach's tenure as Documentation Manager at the Brookfield RCC, her supervisor was Catherine Quartullo, Production Manager for the Brookfield RCC and Appleton RCC. (DPFOF ¶¶ 10, 11; PPFOF ¶ 6.) Quartullo is almost eight years younger than Pechanach. (DPFOF ¶ 12; PPFOF ¶ 7.) Quartullo supervised four departments at the Brookfield RCC: Credit Analysis, Credit Operations, Loan Documentation, and Post Closing. (PPFOF ¶ 8.) Pechanach was the oldest manager Quartullo supervised; managers of the other three departments were approximately ten, eleven, and sixteen years younger than Pechanach. (PPFOF ¶¶ 9-11.)

6

Quartullo's immediate supervisor was John Mau, a forty-six year old, who oversaw management of the Brookfield and Appleton RCCs. (DPFOF ¶¶ 22-24; PPFOF ¶ 12.) Mark Hogan, who is fifty-five, was Executive Vice President of M&I and the highest executive, other than M&I's President, in charge of all RCCs. (DPFOF ¶¶ 40, 41, 43, 44; PPFOF ¶ 22.) Hogan supervised Mau. (PPFOF ¶ 22.) Mary Makarewicz, who is fifty-nine, was the Performance Management Manager in Human Resources, and worked with employees and managers on performance and behavioral issues. (DPFOF ¶¶ 32, 33; PPFOF ¶ 99.)

In June 2002, Pechanach received a pay raise from $56,900 to $60,300 per year. (PPFOF ¶ 29.) She perceived that her review that year was "really good." (PPFOF ¶ 29.) In June 2003, Quartullo gave Pechanach another raise, increasing her salary from $60,300 to $62,700 per year. (PPFOF ¶ 31.)

M&I engaged Metavante consultant Charles Jarrett to review the RCCs. (DPFOF ¶¶ 158, 159; Pl.'s Obj'ns to Def.'s Proposed Findings of Fact ("Pl.'s Obj'ns") ¶ 158.) Jarrett submitted a report to M&I in May 2004, recommending that M&I combine the Brookfield and Appleton RCC documentation groups into one. (DPFOF ¶¶ 162, 163; Pl.'s Obj'ns ¶¶ 162-163; Jarret Aff. Ex. 1038 at 11.) Also in May 2004, Quartullo told Pechanach she had a hard staff to manage because of the strong personalities involved. (PPFOF ¶ 43.)

In June of 2004, Quartullo reviewed Pechanach's performance from April 1, 2003, to April 1, 2004. (DPFOF ¶ 164; *see* Ploor Aff. Ex. A, Ex. 1024.) Quartullo rated

7

Pechanach overall as "Meets Expectations."[3] (DPFOF ¶ 166; PPFOF ¶ 133; Ploor Aff. Ex. A, Ex. 1024 at 2.) Meeting expectations on an annual performance review was "where you want[ed] to be." (PPFOF ¶ 134; Ploor Aff. Ex. F at 64.) However, Quartullo rated Pechanach as "Needs Improvement" regarding: "Consistently leads staff toward overall Corporate objectives of creating value for customers, employees, and shareholders; meets goals"; "Manages change effectively; challenges the status quo and champions new initiatives; acts as a catalyst of change; responds in a positive manner to change and ambiguity"; "Maintains respectful, productive relationships; works across the organization to build value; effectively builds commitment"; and "Manages department workflow and reports by effectively delegating and setting realistic deadlines; has ability to prioritize and keep focus." (DPFOF ¶ 167; Ploor Aff. Ex. A, Ex. 1024 at 1-2.) Pechanach says she had no prior notice of any such deficiencies. (PPFOF ¶ 44.) Pechanach had no "Outstanding" or "Unsatisfactory" ratings, but five "Exceeds Expectations" ratings. (Ploor Aff. Ex. A, Ex. 1024 at 1-2.) Pechanach received a pay raise from $62,700 per year to $65,200 per year. (PPFOF ¶ 45.)

Pechanach had foot surgery the day after her review, on June 4, 2004, and was out for a month. She returned on July 6, 2004, at which point Quartullo informed Pechanach that her department was too dependent on her and that she was tired of running Pechanach's department. (PPFOF ¶¶ 44, 46.)

At the end of July or in early August 2004, Quartullo prepared a list of items to discuss with Pechanach, including challenges, resolutions, and additional

---

[3]The five ratings overall and for seventeen specific performance criteria were, in descending order: "Outstanding," "Exceeds Expectations," "Meets Expectations," "Needs Improvement," and "Unsatisfactory." (Ploor Aff. Ex. A, Ex. 1024.)

8

responsibilities. (DPFOF ¶¶ 177, 178; Ploor Aff. Ex. A, Ex. 1014.) The challenges listed for Pechanach included "[l]imited leadership to staff/lack of direction," "[p]erception of staff that you are focused on personal activities," "[c]ommunication/not asking the staff what's working," "[l]ack of positive attitude." (DPFOF ¶ 179; Ploor Aff. Ex. A, Ex. 1014.) The list was forwarded to Mau and Hogan. (DPFOF ¶¶ 180, 181.) On August 3, 2004, Quartullo met with Pechanach and shared the list with her. (DPFOF ¶¶ 182, 183.)

In September 2004, M&I conducted a quality survey, sending questions to the M&I bankers who were customers of the Brookfield and Appleton RCCs. (DPFOF ¶¶ 184, 186, 187; Pl.'s Obj's ¶ 187; Mau Aff. Ex. 1004.) Exclusive of surveys that left the pertinent questions blank, the results for the two documentation departments combined were: 3% Exceeds Expectations, 87% Meets Expectations, and 9% Needs Improvement.[4] (*See* Mau Aff. Ex. 1004 at 1.) Quartullo e-mailed the results to Pechanach in October 2004. (DPFOF ¶ 188.[5])

On October 15, 2004, Quartullo issued Pechanach a formal performance improvement plan, addressing issues such as the perception that Pechanach spent too much time on personal phone calls, poor customer service, poor marks under a report following a tour by the M&I president, and results of the bankers' survey. (DPFOF ¶¶ 190,

_____

[4]These percentages differ from the parties' proposed findings because the parties failed to account for the different calculations of percentages in this survey and the one conducted a year later. In the 2004 survey results, blank responses were counted in determining percentages, so the denominator for determining the percentages included all 365 surveys rather than the 158 with an answer. In the 2005 survey results, blank responses were excluded, reducing the denominator from all 417 surveys to just 213. The change in percentages as a result was substantial. To compare apples to apples, the court has recalculated the 2004 percentages by excluding the blank responses.

[5]Mau says in his affidavit that these results "were unfavorable" for the Loan Documentation Departments at the Brookfield and Appleton RCCs, but that is his opinion, which is not supported by facts, such as a comparison of these numbers to prior years, surveys of other sites or an explanation that 9% Needs Improvement rating was unacceptable. Mau provided no background as to *why* the survey results were unfavorable, so the court cannot accept his conclusory opinion that they were.

9

191; PPFOF ¶ 49.) The plan stated that "failure to improve your performance will result in further discipline, including termination of your employment." (DPFOF ¶ 192.) Quartullo discussed these issues with Pechanach on October 12, 2004, and implemented weekly meetings with Pechanach. (DPFOF ¶¶ 193, 194.[6])

Thereafter, Pechanach drafted "Pre-Closing Standards" for customer service, error rates and productivity in her department, which Quartullo accepted. (DPFOF ¶ 197.) The standards provided that the "[d]epartment manager will continue to coach staff on how to best serve the lender, using a positive attitude" and that "'[t]he customer (banker) comes first' will be the message." (DPFOF ¶ 198; Pl.'s Obj'ns ¶ 198; Ploor Aff. Ex. A, Ex. 1012 at 3.) An addendum stated that "Cindy will continue to demonstrate a commitment to her job in the company's values and continue to display a positive attitude." (Ploor Aff. Ex. A, Ex. 1013.) These standards ended the performance improvement plan. (DPFOF ¶ 199; Pl.'s Obj'ns ¶ 199.)

Following his report, consultant Jarrett interviewed twenty-five bankers, many of whom expressed concerns about the attitude of the Brookfield RCC documentation staff. (DPFOF ¶¶ 202, 203, 206.) Jarrett concluded that relationships between the bankers and the Brookfield RCC documentation staff had been damaged significantly and would be difficult to repair. (DPFOF ¶ 205; Jarrett Aff. ¶¶ 11-12.) In an e-mail to Mau dated October 18, 2004, Jarrett recommended that the Brookfield RCC documentation department be eliminated and its work taken over by the Appleton RCC. (Mau Aff. ¶¶ 11-12, Ex. 9 at 2.)

---

[6]Pechanach objects to DPFOF ¶ 193 but does not controvert that such a discussion took place.

10

In June 2005, Quartullo completed another performance review of Pechanach through the first quarter of 2005. (DPFOF ¶ 212; Pl.'s Obj'ns ¶ 212.) Again, Pechanach's overall rating was "Meets Expectations." (DPFOF ¶ 214; PPFOF ¶ 58; PPFOF ¶ 133.) She had three criteria rated "Needs Improvement," four criteria rated "Exceeds Expectations," and the remaining twelve criteria rated "Meets Expectations." (DPFOF ¶¶ 215, 216; Ploor Aff. Ex. A, Ex. 1025.) One "Exceeds Expectations" was given in a category that had been a "Needs Improvement" the year before. (*Compare* Ploor Aff. Ex. A, Ex. 1025, *with* Ploor Aff. Ex. A, Ex. 1024.) However, two "Needs Improvement" did not change: leading staff toward corporate objectives and managing department workflow. (*Id.*) Quartullo's comments noted significant customer service issues in 2004 but that "[t]here has been significant improvement . . . since [Pechanach] began using the standards and since several problem staff member[s] have either been terminated or voluntarily left." (Ploor Aff. Ex. A, Ex. 1025 at 1.) Also, Quartullo observed that Pechanach had dramatically increased communication with her staff. (*Id.* at 2-3.) Pechanach received a raise from $65,200 per year to $66,830 per year. (PPFOF ¶ 55.) However, the raise was less than the average at M&I, and she met with Quartullo to discuss it. (DPFOF ¶ 218; Pl.'s Obj'ns ¶¶ 217-218; *see* DPFOF ¶ 217.)

M&I conducted another quality survey in 2005. (DPFOF ¶ 221.) Exclusive of blank responses, the RCC Loan Documentation Departments for Brookfield and Appleton together received results of: 4% Exceeds Expectations (up from 3% in 2004), 89% Meets Expectations (up from 87%), and 7% Needs Improvement (down from 9%). (*See* Mau Aff. Exs. 1004, 1006.) Quartullo received these results, forwarded them to

11

Pechanach on October 7, 2005, and met with her to discuss performance concerns. (DPFOF ¶¶ 223-226.)

Meanwhile, in February 2005, M&I conducted its first employee survey. (DPFOF ¶¶ 29, 31, 32.) This survey was not broken down by departments; it simply compared the Brookfield RCC as a whole against an M&I average. (PPFOF ¶ 110.) The results for the Brookfield RCC were lower than M&I as a whole, identifying four key areas for improvement: performance management, rewards and recognition, team, and manager/supervisor. (DPFOF ¶¶ 34, 36.) Overall job commitment at the Brookfield RCC was 55% versus 78% for M&I as a whole. (DPFOF ¶ 35.[7]) Hogan was disappointed with these results. (DPFOF ¶ 39.) Pechanach was aware of the results of this survey and that Hogan was unhappy with them. (DPFOF ¶¶ 37, 45.)

Following the employee opinion survey, a team from Human Resources met with approximately seventy-one of M&I's senior-level managers, including Hogan, and discussed the results. (DPFOF ¶ 46.) In September 2005, Bonnie Schaefer (age fifty-two), an internal M&I performance consultant, facilitated four small focus groups (two employee groups, one of team leaders and supervisors, and one of managers) to learn why the survey results were so poor, obtain suggestions for improvement, and provide opportunities to improve management issues. (DPFOF ¶¶ 47, 48, 58; Pl.'s Obj'ns ¶ 48; Schaefer Aff. ¶¶ 6-11.) Employees said that they felt they were not being treated professionally by Brookfield RCC management. Employees in the documentation department said they

---

[7]Pechanach objects to DPFOF ¶¶ 34-36 as incomplete, explaining that each manager in the Brookfield RCC completed a survey regarding Quartullo and Mau and that there was confusion regarding which level of manager was being questioned. (Pl.'s Obj'ns ¶¶ 34-36.) However, she does not refute the results of the survey. Therefore, those results are accepted as accurate.

12

were not being treated with respect by team leaders and supervisors, and there was a lack of leading by example, although specific superiors were not named. (DPFOF ¶¶ 49, 50; Pl.'s Obj'ns ¶ 50; *see* Schaefer Aff. ¶¶ 12-13, 17.)

In November, 2005, Hogan e-mailed the Brookfield RCC, outlining four areas on which additional effort would be focused:

> (1) Working with Human Resources' Performance Management area, provide *supervisor/manager development* opportunities for all employees with people management responsibilities.
> (2) Provide better *role clarity*, specifically among team leaders, assistant supervisors, supervisors, and managers.
> (3) Increase the level of *communication*, including both corporate and departmental information.
> (4) Increase the emphasis on *career development* by encouraging managers to routinely have these types of discussions with each employee.

(DPFOF ¶¶ 51, 53, 54; Pl.'s Obj'ns ¶¶ 52-54; Ploor Aff. Ex. A, Ex. 1017.)

On January 11, 2006, a Brookfield RCC manager action plan meeting was held with Schaefer, Quartullo, Pechanach, and other Brookfield RCC management. (DPFOF ¶ 59.) Schaefer shared some of their employee comments from the focus group: a lack of trust; team leaders not helping when work piles on; a department that was gossipy, catty, and cliquey; supervisors and team leaders handling manager jobs like discipline and evaluations; a manager not confronting issues directly; and a stressful department. (DPFOF ¶ 60, 61.)

The meeting included a training film about accountability, how to "pump up" staff and how employees could control their own destinies. (DPFOF ¶ 62; Pl.'s Obj'ns ¶ 62; Ploor Aff. Ex. A at 113.) After the movie, Pechanach asked whether employees would get to see the movie because employees had an equal say in their performances. (DPFOF

13

¶ 64: Pl.'s Obj'ns ¶¶ 63-65.)  Pechanach noted that it was "not just the managers going out there and making the employees happy, that the employees had to contribute to that." (DPFOF ¶ 65; Pl.'s Obj'ns ¶¶ 63-65.)   Schaefer thought Pechanach dominated the discussion and thought Pechanach was focusing on employees' actions and shifting blame instead of accepting responsibility for her part in making things better.  (DPFOF ¶¶ 66, 67; Schaefer Aff. ¶¶ 21-22.)  Schaefer believed that the Brookfield RCC needed to move to a positive, collaborative management style to improve employee feedback.  (Schaefer Aff. ¶ 23.)  She concluded that Pechanach was unable to lead her group in a positive manner. (DPFOF ¶ 68; Schaefer Aff. ¶ 24.[8])  Schaefer shared her opinions and conclusion with Quartullo shortly after the meeting, saying she had serious concerns about whether Pechanach could be successful as a manager in the future.  (DPFOF ¶¶ 69-71; Schaefer Aff. ¶¶ 25-26; Quartullo Aff. ¶ 16.[9])   Schaefer then debriefed Hogan on the manager meeting.  (DPFOF ¶ 71; Pl.'s Obj'ns ¶ 71; Schaefer Aff. ¶ 25; Ploor Aff. Ex. E at 45-46.)

Quartullo met with Pechanach one-on-one to discuss the RCC manager action plan meeting.  (DPFOF ¶¶ 72, 73.)  Quartullo told Pechanach that she was upset that none of the managers contributed to the conversion and that the meeting was

---

[8]Pechanach objects to DPFOF ¶¶ 66-67 because other managers were silent at the meeting and because Quartullo told Pechanach she was upset with how all of the managers reacted.  The objection does not meet the facts in the proposed findings.  Other managers' responses and Quartullo's reaction are not material to what Schaefer's interpretation of the meeting was.  Pechanach moves to strike DPFOF ¶ 68 because it is a conclusion more appropriate to be determined by the fact-finder and Schaefer was not a decision-maker.  That Schaefer had this opinion does not mean that her opinion was correct. But the opinion itself is relevant, as Schaefer passed it along to Quartullo and Hogan.

[9]Pechanach objects to these proposed findings because the conclusions relayed by Schaefer to Quartullo and Hogan are not identified with specificity, nor are the dates and times of the conversations identified.  (Pl.'s Obj'ns ¶¶ 69-71.)  However, Schaefer says her conversation with Hogan occurred "around the time" of the employee opinion survey meetings and that she debriefed him after the focus groups and manager meeting.  Schaefer's conversations with Quartullo occurred "shortly after their meeting."  (Schaefer Aff. ¶ 26; Quartullo Aff. ¶ 16.)

14

negative, and she intended to talk with each of the managers. She said she did not like what Pechanach had said at the meeting and that Pechanach's comments were negative. (DPFOF ¶¶ 74, 75; Pl.'s Obj'ns ¶¶ 72, 74; PPFOF ¶ 65;Ploor Aff. Ex. A at 114-15.) Quartullo commented that upper management wanted Brookfield RCC to improve relations between employees and managers. (DPFOF ¶ 76; Ploor Aff. Ex. A at 115, Quartullo Aff. ¶ 17.[10]) As a result, Pechanach knew that Quartullo was upset. (DPFOF ¶ 77; Pl.'s Obj'ns ¶ 77.)

In February 2006, Quartullo submitted a plan of action to Pechanach and others to address the survey. (DPFOF ¶¶ 79, 80; Pl.'s Obj'ns ¶ 80; *see* Ploor Aff. Ex. A, Ex. 1016.) The plan referenced four issues, who was responsible for action, improvements that would be made, and how they would be measured. (Ploor Aff. Ex. A, Ex. 1016 at 2-3.) Listed under the issue of supervisor/manager development was "[e]ncourag[ing] greater accountability in leadership roles for creating a supportive, appreciative environment." (DPFOF ¶ 82; Pl.'s Obj'ns ¶ 82; Ploor Aff. Ex. A, Ex. 1016 at 3.)

On or shortly before February 21, 2006, Marsha Olson, the Loan Documentation Department manager at the Appleton RCC, told Quartullo that Pechanach had not been responsive to her over the prior two months. (DPFOF ¶ 83.[11])

---

[10]Pechanach objects to this proposed finding because she specifically recalled how upset Quartullo was regarding the managers after the movie. However, that Quartullo mentioned her thoughts on the other managers does not negate that she said in addition that upper management wanted relations to improve.

[11]Pechanach objects to this proposed finding as irrelevant because Quartullo did not relay this complaint to Hogan, Mau, or Makarewicz. However, she does not refute the fact, and the court finds it marginally relevant. The remainder of Pechanach's objection is not on point, as it adds additional facts and argument concerning relevance.

15

By January 30, 2006, Pechanach, with Quartullo's approval, had hired Marlo Evans as Documentation Supervisor. (PPFOF ¶ 66.) Evans was more than seventeen years younger than Pechanach. (PPFOF ¶ 66.) Evans started on February 6, 2006. (PPFOF ¶ 67.) During Evans's meetings with department staff, a number of staff members told him they were afraid to voice their concerns to Pechanach, felt intimidated by her, and were not willing to share information with her. (DPFOF ¶¶ 94-97.[12]) On February 23, Evans told Quartullo that staff were afraid of Pechanach and there was a lack of trust in the department. (DPFOF ¶¶ 98, 99.)

On February 21, 2006, Sharon Susnik (age fifty-one), the Brookfield RCC Post Closing Department manager, had told Pechanach that she was frustrated because people in her department were meeting with people in Pechanach's department, changing procedures without letting others know about it and holding extended personal conversations during work hours. (PPFOF ¶¶ 11, 70; Ploor Aff. Ex. A at 38-39.) Susnik asked Pechanach to draft an e-mail for each of their groups to stop the changing of procedures and the personal conversations. (PPFOF ¶ 71.) Pechanach drafted and circulated an e-mail on February 21, 2006, for each of their groups entitled "Questions, problems, answers?? From Sharon Susnik and Cindy Pechanach." (DPFOF ¶ 102; PPFOF ¶ 72; Ploor Aff. Ex. A, Ex. 1002.) The e-mail read in its entirety:

> With Gold Bank coming in very soon, the manager's [sic] in the RCC are working very hard to strengthen procedures and make sure all policies are in place. We are also making sure the the [sic] Appleton RCC is running the same as we are.

---

[12]Pechanach objects to these proposed findings as hearsay, but the truth of the matter asserted is not the point. The point is that Evans relayed such complaints to Quartullo.

16

So, in the spirit of keeping everything 'standard' we are asking the staff to not meet amongst themselves or with other staff people from other departments about 'questions, problems and answers'. When you are trying to work through a problem or question, your first line of defense is your team lead. Then, if the team lead does not know what to do, you can both see a supervisor or manager. When it involves another department, the supervisor or manager will visit a supervisor or manager from that department, and everyone will be made aware of any changes. When you 'visit' among yourselves to solve things, nothing really gets solved because no one else in the department or any other department will learn the 'answer to the question'.

Going forward, when a supervisor or manager sees a group of people together talking, we will probably 'dip' to find out what is going on.

If the conversation happens to be of a personal nature, we will be asking everyone to 'move on', as there certainly is plenty of work to be done.

Thanks for your understanding and please see us with any questions or concerns.

Cindy Pechanach
Sharon Susnik

(DPFOF ¶ 103; Pl.'s Obj'ns ¶ 103; Ploor Aff. Ex. A, Ex. 1002.)

Shortly thereafter, someone anonymously forwarded the e-mail to Hogan through interoffice mail. (DPFOF ¶¶ 105, 106; PPFOF ¶ 73.) Hogan thought the e-mail was unprofessional, overbearing, and not in the spirit of trying to improve employee morale at the Brookfield RCC. (DPFOF ¶¶ 109-111.)

On February 24, Hogan met with Mau and showed him the e-mail. (DPFOF ¶ 112; PPFOF ¶ 74.) Hogan expressed his disappointment by the tone and tenor of the e-mail, which he said was not consistent with what M&I was trying to accomplish. (PPFOF ¶ 74.) Specifically, Hogan was disappointed because the e-mail was overbearing; he did

17

not feel asking subordinates to move on even when conducting personal conversations was professional. (PPFOF ¶ 75.) Hogan told Mau to handle the Pechanach/Susnik e-mail and told Mau and Quartullo to speak with Pechanach and Susnik to determine why the e-mail was sent. (PPFOF ¶ 76; Def.'s Resp. ¶ 76; Ploor Aff. Ex. E at 29.)

Mau then met with Quartullo, who had not seen the e-mail previously. (Pl.'s Obj'ns ¶ 119; PPFOF ¶ 77; Ploor Aff. Ex. D at 24-25.) Mau told Quartullo that Hogan was disappointed that the e-mail was not within the spirit of what the employee opinion survey was to accomplish and that he agreed with Hogan. He suggested she meet with each person to review the background, context and tenor of the e-mail, and wanted her to determine an appropriate course of action. (PPFOF ¶ 77.) Mau did not tell Quartullo what the appropriate course of action should be, but he thought she would talk to Pechanach and Susnik, learn the facts, and coach them as to alternative methods of handling issues. (PPFOF ¶ 78.)

Quartullo thought the e-mail addressed the staff as if they were children and was inappropriate when M&I was trying to build better employee teams and wanted employees to feel as though they were working in a collaborative environment. (DPFOF ¶¶ 122-125; Ploor Aff. Ex. B at 35-36.) At some point, Quartullo spoke with Susnik, who told Quartullo that Pechanach wanted to send the e-mail and drafted it. (DPFOF ¶¶ 126, 128; Pl.'s Obj'ns ¶ 126-128.[13]) Quartullo told Susnik that the e-mail was inappropriate, that e-mails should not talk down to staff, and that M&I wanted the staff to feel they were

---

[13]Pechanach objects to DPFOF ¶ 128 as hearsay, but the proposed finding goes to what Quartullo was told, not the truth of the matter asserted.

18

working in a collaborative environment.  (DPFOF ¶¶ 133-135.[14])  After talking with Susnik, Quartullo concluded that Pechanach was the driving force behind the e-mail and that Susnik simply joined Pechanach.  (DPFOF ¶ 132.[15])

On February 27, Hogan met with Quartullo about the e-mail.  (DPFOF ¶ 113.) Hogan recalls that Mau and Quartullo came back to him and told him Pechanach wrote the e-mail and stood by the words in it; he learned that even though Susnik signed on to the e-mail, she was not directly involved in writing or phrasing it.  (PPFOF ¶¶ 80, 81.)  Hogan took no action against Susnik because he was informed by Mau and Quartullo that Pechanach had written it.  (PPFOF ¶ 97.)  However, Hogan told Mau and Quartullo that he wanted Pechanach removed from her management position but not terminated.  (DPFOF ¶ 114 [16]; PPFOF ¶ 96; Def.'s Resp. ¶ 96; Ploor Aff. Ex. E at 32.)  Quartullo believed that Hogan was telling her something needed to be changed.  (DPFOF ¶ 121.[17])

Hogan does not recall if anyone brought to his attention that there was a productivity problem in the RCC regarding employees talking together too much.  (PPFOF ¶ 82.)  However, Quartullo knew there was a productivity problem in the RCC during the days leading up to the Pechanach/Susnik e-mail and that it was a supervisor's job to correct employees from socializing.  (PPFOF ¶¶ 83, 84.)  Hogan never spoke to

---

[14]Pechanach objects to these proposed findings as hearsay, but the truth of the matter is not their purpose.  These proposed findings confirm that these were Quartullo's thoughts at the time, not that she was correct.

[15]Pechanach's objection to this proposed finding misses the mark.  *Why* Quartullo thought this is not pertinent.

[16]Pechanach objects to this proposed finding because Mau did not recall such a statement at his deposition.  However, Hogan states this clearly, and Mau's testimony does not refute the proposed fact.

[17]Pechanach objects to this proposed finding as speculative, but Quartullo's own belief is known to her.  She may have misinterpreted Hogan, but she believed what she believed.

19

Pechanach about the e-mail; instead, he relied on information from Mau and Quartullo. (PPFOF ¶ 87, 88.)

Hogan met Pechanach in 1977, when they worked together in the credit department. (PPFOF ¶ 89.) Hogan knew Pechanach was a good practitioner and, since 1977, believed that she had an overbearing personality. (PPFOF ¶¶ 90, 91.) Early on in Pechanach's role as manager of the Loan Documentation Department, Hogan knew Pechanach had an overbearing management style. (PPFOF ¶ 92; Ploor Aff. Ex. E at 43-44, 47-48.) Prior to receiving the Pechanach/Susnik e-mail Hogan and Quartullo discussed complaints about Pechanach as manager in the Brookfield RCC. (PPFOF ¶ 94; Def.'s Resp. ¶ 94; Ploor Aff. Ex. E at 33.) Hogan says Pechanach's management style did not rise to the level of requiring action until March 2006, because he believed M&I was giving Pechanach an opportunity to change her management style. (PPFOF ¶ 93; Def.'s Resp. ¶ 93; Ploor Aff. Ex. E at 48.)

Any action concerning Pechanach's performance in management was Quartullo's responsibility, as she was Pechanach's direct supervisor. (PPFOF ¶ 95.) At Hogan's direction, Quartullo contacted Makarewicz. (DPFOF ¶ 136: Pl.'s Obj'ns ¶ 136; *see* PPFOF ¶ 98.) Quartullo gave Makarewicz a copy of the Pechanach/Susnik e-mail and told Makarewicz that Hogan wanted Pechanach removed from her management job. (DPFOF ¶ 137; PPFOF ¶¶ 100, 105.) Makarewicz never saw any other complaint about the e-mail. (PPFOF ¶ 101.) Quartullo was asked by Makarewicz to prepare a summary of

20

Pechanach's performance deficiencies in the previous six months to a year. (DPFOF ¶ 138; Ploor Aff. Ex. B at 55.[18])

Makarewicz called Hogan that day or the next and Hogan informed her that he did not feel Pechanach could be effective as a manager. (PPFOF ¶ 106.) Hogan told Makarewicz that the e-mail was the last straw in Pechanach's management of employees. (PPFOF ¶ 107.) Although Hogan and Makarewicz did not discuss specific survey results, the employee opinion and quality surveys and the focus groups were mentioned as an example of Pechanach's past performance. (PPFOF ¶ 108.) Hogan believed that Pechanach had had ample opportunity to work through the issues that arose in the employee survey, and had not shown any results. (DPFOF ¶ 116; Ploor Aff. Ex. E 31.[19])

Makarewicz did not compare the results of Pechanach's department to other departments or managers in the RCC for the two years prior to February 2006; that was the job of Quartullo and the others working on the performance issues in the RCC, such as Mau, Schaefer, Tina Travia and Amy Dexheimer. (PPFOF ¶ 112; Def.'s Resp. ¶ 112; Ploor Aff. Ex. C at 33-34.) However, Makarewicz spoke with Schaefer in late February 2006 regarding Pechanach's participation in the follow-up focus groups and learned that Pechanach felt her employees needed to make changes rather than her. (PPFOF ¶ 113.) Makarewicz and Schaefer did not discuss whether Pechanach could be coached. (PPFOF

---

[18]Pechanach objects to this proposed finding as vague and a mischaracterization of the evidence, but instead of pointing out any inaccuracy she adds various additional facts. The objection is off-point and overruled. Further, the deposition page cited supports the proposed finding.

[19]Pechanach objects as a mischaracterization of the evidence, but the citation to Hogan's deposition supports this.

21

¶ 117.)  Schaefer told Makarewicz that Pechanach could not be effective as a manager in the future.  (DPFOF ¶ 152.)

As of February 27, Makarewicz knew that Quartullo, Mau and/or Hogan wanted Pechanach removed from her job as a manager, and Makarewicz told Quartullo that M&I had to write a formal performance improvement plan for Pechanach.  (PPFOF ¶ 137; Def.'s Resp. ¶ 137; Ploor Aff. Ex. C at 103.)  Quartullo told Makarewicz that Pechanach did not have the ability to succeed as a manager.  (PPFOF ¶ 138.)

Makarewicz asked Quartullo what Susnik's involvement was in the e-mail and learned Quartullo had not spoken to Susnik yet.  (PPFOF ¶ 119.)  Quartullo told Makarewicz that she believed Pechanach wrote the e-mail because of the way it was worded.  (PPFOF ¶ 121.)

Pursuant to M&I's guidelines for discipline, verbal conversations about performance are followed by written warnings or performance improvement plans.  (PPFOF ¶ 126; Ploor Aff. Ex. C at 45-46.[20]) As of February 2006, Makarewicz knew that Pechanach was not on a performance improvement plan.  (PPFOF ¶ 125.)  According to Makarewicz, as of February and March 2006, Pechanach could not be removed from her manager's position under the M&I guidelines until a more formalized method, such as a written warning or performance plan, had taken place.  (PPFOF ¶¶ 126, 128; Def.'s Resp. ¶ 128; Ploor Aff. Ex. C at 45-46.)  On February 27 or 28, Makarewicz and Quartullo discussed meeting with Pechanach, and Quartullo said that to formalize discipline she would put

---

[20]M&I objects to this proposed finding as unsupported by Pechanach's cite, which is to page 96 of the Makarewicz deposition.  M&I is correct that no support is found on page 96.  Luckily for Pechanach, the court read the pertinent testimony in connection with proposed findings 123 and 124, so the objection is overruled.

Pechanach on a second performance improvement plan.  (PPFOF ¶ 124; Def.'s Resp. ¶ 124; Makarewicz Dep at 44-45.)

On February 27, 2006, Quartullo met with Amy Dexheimer, Performance Management Consultant, regarding employee feedback on Pechanach.  (DPFOF ¶ 139.) Dexheimer told Quartullo that employees continually described Pechanach as intolerant, impatient, abrupt, unapproachable, and aggressive in her management style, and that they said they were fearful of and did not trust Pechanach.  (DPFOF ¶¶ 140, 141.[21])

In late February or early March 2006, Quartullo prepared a summary of Pechanach's performance deficiencies and gave the summary to Makarewicz.  (DPFOF ¶¶ 144, 145.)  Makarewicz reviewed Quartullo's notes.  (DPFOF ¶ 146.)  On the same or next day, Makarewicz talked with Hogan about his request to remove Pechanach from her managerial job.  (DPFOF ¶ 147.)  Hogan told Makarewicz that he did not think Pechanach could effectively manage people in the future.  (DPFOF ¶ 148.)

At some point Makarewicz talked with Tina Travia, Performance Management Consultant, about her knowledge about Pechanach.  (DPFOF ¶ 153.)  Travia told Makarewicz that several employees had complained to Travia about Pechanach, describing Pechanach as too direct, intolerant, impatient, abrupt, unapproachable, and aggressive in her management style.   (DPFOF ¶¶ 154-156.[22])

---

[21]Pechanach objects to these proposed findings as hearsay because no documentation supports them and Dexheimer does not identify who made the statement to her, where, and when, etc. But even if Dexheimer outright lied to Quartullo, these statements are not hearsay because the truth of the statements to Dexheimer is not at issue.  At issue is what Quartullo was told about Pechanach.

[22]Pechanach objects on hearsay grounds, but again the statements are not provided for their truth but instead for what Makarewicz had been told.

23

At the end of February 2006, Makarewicz decided to offer Pechanach three options: (1) look for employment inside M&I and accept a severance package of twenty-four weeks' pay; (2) look for employment outside M&I and accept a severance package of twenty-four weeks' pay; and (3) remain in her current position on a formal performance improvement plan. (DPFOF ¶ 227; PPFOF ¶ 140.) Makarewicz suggested the first two options for Pechanach. (DPFOF ¶ 230; Pl.'s Obj'ns ¶ 230; PPFOF ¶ 139.) Severance options are offered to employees based on seniority, longevity, and the likelihood of success on a performance plan. (PPFOF ¶ 141.) Quartullo had come up with the option of the formal performance improvement plan, but Makarewicz, perhaps based on what Quartullo had told her, believed the chance of Pechanach being successful on a performance improvement plan was slim. (DPFOF ¶ 228; Pl.'s Obj'ns ¶ 228; PPFOF ¶ 123.) Quartullo had no idea what the plan was to include. (PPFOF ¶ 130.) Makarewicz was not aware of Pechanach's annual performance evaluations for 2004 or 2005 and did not consider them because the options presented to Pechanach were based on other information. (PPFOF ¶ 143.)

Makarewicz and Quartullo met with Pechanach on March 1, and Makarewicz presented Pechanach with the three options. (DPFOF ¶¶ 239-241; PPFOF ¶ 122.) A memorandum outlined the options and explained that Pechanach's performance as a manager had been unacceptable, Pechanach's area had consistently received the lowest ratings on quality surveys, and the focus groups following the employee opinion survey

24

confirmed that her employees were disengaged due to poor management performance. (DPFOF ¶¶ 242, 243.[23])

Quartullo acknowledged that Pechanach always took responsibility for her department and had done everything Quartullo asked her to do. (PPFOF ¶¶ 152-153; Pl.'s Obj'ns ¶ 244; Ploor Aff. Ex. A at 84.) However, Quartullo told Pechanach that in the prior months they had become aware that she was not an effective manager and pointed to the Pechanach/Susnik e-mail as an example. (PPFOF ¶ 145.) Quartullo then described that she, Hogan, and Mau found the e-mail condescending and insulting to Pechanach's staff. (PPFOF ¶ 146.) Quartullo stated that the e-mail was inappropriate in light of the efforts that were being made to try to improve staff relations after the employee opinion survey, condescending to staff, and an example of how she was not an effective manager. (DPFOF ¶ 245; Pl.'s Obj'ns ¶ 245.) When Pechanach responded to Quartullo's comments, Makarewicz replied: "This meeting is not about what you did or didn't do, it's about telling you your options." (PPFOF ¶¶ 147-148.) Pechanach tried to explain the circumstances behind the e-mail, but Makarewicz responded that it appeared Pechanach was refusing to accept responsibility; Makarewicz said the meeting was to explain options, not to let Pechanach defend her actions. (PPFOF ¶¶ 150-151.)

Makarewicz told Pechanach that Quartullo and Mau did not believe she was capable of succeeding under a performance plan and was not capable of managing the department anymore. (PPFOF ¶ 155; Def.'s Resp. ¶ 155; Ploor Aff. Ex. A at 218.)

---

[23]Pechanach objects to these proposed findings of fact, asserting that the memo is factually incorrect and that Quartullo told her in January 2006 that the department was getting better and Pechanach was meeting expectations. While the accuracy of the memo may be a subject for discussion in Pechanach's brief, it is not a proper objection to the proposed findings. The memo said what it said.

25

Quartullo added: "We just don't like your management style anymore. When you joined us, it fit in with what we wanted. Now, it no longer fits with the philosophy of the RCC and we do not think you are capable of changing." (PPFOF ¶ 156.) The meeting ended with Makarewicz asking Pechanach to let Quartullo know her decision the next day, March 2. (PPFOF ¶ 157.)

Pechanach came to work the following day but went home sick at 9:30 a.m. (DPFOF ¶ 252; PPFOF ¶ 159.) Quartullo left the office unexpectedly that day due to the death of her mother. (DPFOF ¶ 253; *see* PPFOF ¶ 158.)

Pechanach went to work on Friday, March 3, 2006 (DPFOF ¶ 254), at which time Makarewicz asked Pechanach if she made a decision on the three options (DPFOF ¶ 255; PPFOF ¶ 160). Pechanach said she had not decided, but requested severance paperwork, which Makarewicz provided. (DPFOF ¶¶ 256, 257; PPFOF ¶ 160.) That day, Pechanach looked for another open position at M&I but did not find anything she was qualified to do or for which the hiring person would not have telephoned Quartullo and Mau. (DPFOF ¶ 283; PPFOF ¶ 187.) Pechanach speculates that "there had to have been jobs in loan services or even at the M&I Mortgage Corp. or in some area where I would have something to do with documentation." (Ploor Aff. Ex. A at 221; *see* PPFOF ¶ 223; Def.'s Resp. ¶ 223.)

At about 3:30 p.m. on March 3, Makarewicz told Pechanach that Mau wanted her on paid leave until Quartullo returned. (DPFOF ¶¶ 259, 262; PPFOF ¶ 161.) Makarewicz indicated Pechanach could return to the office when Quartullo returned on either March 8 or 9. (DPFOF ¶¶ 260, 261; Pl.'s Obj'ns ¶ 261; Ploor Aff. Ex. A at 129-30.)

26

Pechanach went in over the weekend (March 4-5) and cleaned out her personal belongings.  (DPFOF ¶ 264; Pl.'s Obj'ns ¶ 264; PPFOF ¶ 163.)  Pursuant to the paid leave condition, Pechanach stayed home on March 6 and 7.  (PPFOF ¶ 164.)  She called in sick on March 8.  (PPFOF ¶ 165.)

Quartullo returned to work on March 9, but Pechanach did not.  That day Pechanach e-mailed Quartullo and Makarewicz, informing them that she could not agree to any of the employment options presented to her.  She said she believed she met or exceeded the 2004 pre-closing standards and so could not agree to any further performance standards.  (DPFOF ¶¶ 265-269; PPFOF ¶¶ 166, 168.)  During the afternoon of March 9, Pechanach e-mailed Quartullo and informed her that due to her doctor's advice, she would be out on Friday, March 10.  (PPFOF ¶ 167.)

On March 10, Makarewicz called Pechanach and told her she could not refuse all the options but had to pick one.  (PPFOF ¶ 169.)  Pechanach asked what would happen if she turned down all three options.  Makarewicz responded that she would fire Pechanach for insubordination.  (DPFOF ¶¶ 271-273; PPFOF ¶ 171.)

Later that day, Pechanach e-mailed Makarewicz to confirm her three options and let M&I know she was using a sick day on Monday, March 13.  (PPFOF ¶ 174.)  In response to Pechanach's mention of prior instances when M&I found another job for an employee, Makarewicz called Pechanach back to tell her that Quartullo had created a fourth option to allow her to stay in the RCC:  transfer to a position as the document group consultant or as a quality control analyst.  (DPFOF ¶¶ 274, 277, 279; Pl.'s Obj'ns ¶¶ 274, 277; PPFOF ¶ 175.)  The two positions were seven salary grades lower and paid at least $12,000 less per year than Pechanach was making; they were demotions.  (DPFOF ¶ 278;

27

Pl.'s Obj'ns ¶¶ 277, 278; PPFOF ¶¶ 181, 183.) One position would have reported to a subordinate whom Pechanach had written up; the other would have reported to Evans, whom Pechanach had just hired. (PPFOF ¶¶ 178, 179.) Makarewicz confirmed that Quartullo was convinced Pechanach did not have the ability to succeed as a manager, but offered the other positions as a fourth option. (PPFOF ¶ 176.) At the time Makarewicz communicated this fourth option, the two positions offered were the only openings at the Brookfield RCC. (DPFOF ¶ 281; Pl.'s Obj'ns ¶ 281; *see* PPFOF ¶ 184.) There was no discussion of creating a new position for Pechanach at her grade level. (PPFOF ¶ 182.)

Makarewicz told Pechanach to call her on Monday, March 13, with her decision. (DPFOF ¶ 284.) On March 13, Pechanach called Makarewicz and told her that she declined all of the options. (DPFOF ¶ 286.) Pechanach told Makarewicz that all four options were unfair, the performance plan was simply offered to set her up to fail, she had not been given proper notice that she was not doing a good job, she had no plans to retire, and she still wanted to be a manager. (PPFOF ¶¶ 190-192.) Pechanach declined the transfers because the positions reported to her former subordinates and placed her at a lower grade level with a substantial reduction in pay. (DPFOF ¶ 287; Pl.'s Obj'ns ¶ 287.) Pechanach declined the severance option involving looking for a new job within M&I because she did not want to work anywhere but the RCC. (PPFOF ¶ 193.) Also, she believed the chances of her getting another position at M&I were small because, among other reasons, there were no open positions at her grade level except for those for which the hiring person would call Quartullo or Mau. (DPFOF ¶ 288; Pl.'s Obj'ns ¶ 288; Ploor Aff. Ex. A at 139, 144.) However, Mau never said anything to Pechanach that would have led

28

her to believe he would have said negative things about her to prohibit her from finding another job at M&I. (DPFOF ¶ 290.)

M&I discharged Pechanach on March 13 for insubordination. (DPFOF ¶¶ 292, 294; PPFOF ¶ 195.) On that date, Pechanach was fifty-seven years, nine months old. (PPFOF ¶ 1.) Makarewicz made the decision to discharge Pechanach. (DPFOF ¶ 293.[24]) M&I paid Pechanach for all work days through March 13, 2006. (DPFOF ¶ 295.) At the time of her termination, Pechanach was at a grade 23 salary level, earning $66,830 per year. (DPFOF ¶¶ 8-9; Pl.'s Obj'ns ¶ 8; PPFOF ¶¶ 4-5.)

In July 2004, Pechanach had told Quartullo she was tired of managing people, but Quartullo responded that Pechanach was too good at managing people and it would be a waste not to have her do that. (PPFOF ¶ 220.) As recently as January 2006, Quartullo told Pechanach that "the department's getting better, things are looking up . . . you're meeting the expectations, you're doing what I asked you to do, the reports are terrific, love the reports." (Pechanach Dep. at 219-20; *see* PPFOF ¶ 127.) Prior to March 2006, Quartullo told Toni Dettmann, Credit Operations Manager, that Pechanach was her strongest manager because she was straightforward, got her work done, and always plowed ahead. (PPFOF ¶ 200.)

Dettmann considered Pechanach to be upbeat and cooperative. (PPFOF ¶ 207.) When Dettmann received complaints from bankers about loan documents, she would go to Pechanach to fix them. (PPFOF ¶ 209.) When Dettmann was having a problem and told Quartullo she was going to use Pechanach as a resource, Quartullo

_____

[24]Pechanach objects to this proposed finding of fact, but her objection is off-point and consists of argument.

would approve.  (PPFOF ¶ 211; Def.'s Resp. ¶ 211.)  Dettmann received complaints from bankers about Susnik's department, as they had trouble keeping up with their work. (PPFOF ¶ 210.)

Pechanach is unaware of any other manager at M&I who declined to follow an instruction from Human Resources.  (DPFOF ¶ 291.)  However, an employee named "Joan" was deemed insubordinate on March 23, 2005, for failing to follow a supervisor's order, but her insubordination resulted in a written warning rather than termination.  (Pl.'s Obj'ns ¶ 297; Rettko Aff, Ex. H.)

In July 2007, M&I terminated the employment of "Amanda," then twenty-three years old, a Customer Service Representative I, for insubordination.  During the two-week period following her giving of notice, Amanda had yelled at her supervisor, and M&I terminated her that same day.  (DPFOF ¶ 300-302.[25])  Amanda was at grade level six, earning $8.75 an hour.  (Pl.'s Obj'ns ¶ 300.)

In March 2000, Lynette Micale, age thirty-four, held the position of Credit Operations Department Manager (grade 18) at the Brookfield RCC.  (DPFOF ¶¶ 303, 304; PPFOF ¶ 10.)  Another employee, Jean Gilbert, who had been performing both training and compliance manager functions, could no longer perform as the RCCs grew, so Gilbert's position was split.  Gilbert continued as the training manager, while a new Compliance Manager position was created by Mau and Quartullo.  (DPFOF ¶¶ 306-309; Pl's Obj'ns ¶¶ 310, 311; PPFOF ¶¶ 13, 19.)

_____

[25]Pechanach objects to DPFOF ¶ 300 because Amanda's situation was not comparable to Pechanach's, but that is argument, not a proper objection.

Micale was given the compliance position. (DPFOF ¶¶ 311, 312.) This was a lateral move for Micale with no pay or grade change. (DPFOF ¶ 313; PPFOF ¶ 19.) Micale was earning $46,500 per year when she transferred, but Quartullo considered Micale a contemporary of Pechanach at the time, as both were supervising sections under Quartullo. (DPFOF ¶ 314; Pl.'s Obj'ns ¶ 314; PPFOF ¶ 17; Ploor Aff. Ex. B at 62-64.) Prior to Micale's move, Quartullo had asked Pechanach to work with Micale to make her a better manager because Pechanach was Quartullo's strongest manager. (PPFOF ¶ 14; Ploor Aff. Ex. A at 100-01.)

Micale's replacement as Credit Operations Manager was Toni Dettmann, age fifty-four. (PPFOF ¶ 13; DPFOF ¶ 320.) Dettmann was told by Quartullo or Mau that Micale was removed from her position because of concern with her management style with employees and that had she not been removed as a manager there was a likelihood of her being terminated. (DPFOF ¶ 318; PPFOF ¶ 15; Def.'s Resp. to Pl.'s Proposed Findings of Fact ("Def.'s Resp.") ¶ 15.) Micale was never placed on a performance plan when she was Credit Operations Manager. (DPFOF ¶ 319.) However, at some point prior to Micale's lateral move, an employee had complained about her making an inappropriate comment about foreigners, and Micale told Dettmann that an employee had filed a racial complaint against her with Human Resources. (DPFOF ¶ 316; PPFOF ¶ 16.) Micale did make one totally inappropriate comment. (PPFOF ¶ 18; Def.'s Resp. ¶ 18.)

In August and September 2005, it was recommended that the Credit Operations departments in the Brookfield and Appleton RCCs be merged into other departments. (DPFOF ¶ 322.) Dettmann, who managed fifteen people, and her counterpart in the Appleton RCC lost their jobs because their positions were eliminated

31

when their departments were consolidated into others. (DPFOF ¶ 323[26]; PPFOF ¶¶ 212, 216) At the same time, Mau and his superiors decided to keep the Brookfield Loan Documentation Department in place. (DPFOF ¶ 329.) However, Mau was concerned about how to regain credibility with the bankers and wanted a focused effort on customer service to them. (DPFOF ¶ 330.) He decided that the Brookfield RCC needed a customer service job that would seek out the opinions of bankers regarding the RCCs' efforts, monitor quality, provide customer service, and recommend process improvements. (DPFOF ¶ 331.) A Customer Service Manager position, at grade 18, was created and offered to Dettmann when her previous job was eliminated; the job was not posted. (DPFOF ¶ 332; PPFOF ¶ 214.) Dettmann's strong customer skills served a business need in light of the customer service needs identified by Jarrett and a reduction in time Quartullo had to spend on customer service issues. (DPFOF ¶¶ 333-335.) In September 2005, Quartullo and Mau moved Dettmann to the new Customer Service Manager position. (PPFOF ¶¶ 213-215.)

Quartullo had told Pechanach that Dettmann was late with her reports, did not get performance reviews done timely, and was often unavailable to her staff. (Pl.'s Obj'ns ¶ 323; PPFOF ¶ 217; Ploor Aff. Ex. A at 86.) Dettmann's performance reviews as Credit Operations Manager for 2004 and 2005 gave her overall ratings of "meets expectations." (PPFOF ¶ 219.) Moreover, she had never been on a performance plan. (DPFOF ¶ 327.)

---

[26]Pechanach objects to this proposed finding, stating that Dettmann was late with her reports, did not get performance reviews done timely, and was often unavailable to her staff. However, the proposed finding is unrefuted as to the merging of the departments and the actual trigger for the job loss.

In January 2006, Pechanach informed Quartullo she would love to have the Customer Service Manager position Dettmann had.  (PPFOF ¶ 222.)

On or about May 29, 2003, M&I informed "Joe," then forty-eight and at a salary grade 28, that he was being replaced as Regional Collections Manager.  Joe's manager concluded he could no longer perform the job.  M&I informed Joe that he could either report to the new department head with a pay cut of over $30,000 or accept severance of twenty-four weeks to look for a job outside of M&I.  (DPFOF ¶¶ 231-235.)

On or about September 1, 2005, M&I removed "Douglas," then forty-seven, from his job as Client Services Manager, with a salary grade of twenty-eight.  Douglas's manager concluded Douglas lacked the skill set to perform the job in the future. (Makarewicz Aff. ¶ 32, Ex. 1041.)  M&I paid Douglas severance from September 1, 2005, through January 31, 2006, when M&I terminated him.  Douglas applied for another position at M&I and was hired as Credit Card Business Line Manager on April 24, 2006, at the same annual pay as when his employment ended ($104,000).  (DPFOF ¶¶ 234-238.[27])

In general, Pechanach describes her relationship with Quartullo as one where they were nice to each other rather than hostile.  (DPFOF ¶ 336; Pl.'s Obj'ns ¶ 336.) Pechanach and Quartullo engaged in casual, non-work-related conversations that were funny.  (DPFOF ¶ 337.)

When Pechanach started at the Brookfield RCC, she and Quartullo teased each other back and forth about wanting to retire.  (DPFOF ¶¶ 338, 339.)  In January and

---

[27]Pechanach objects to DPFOF ¶¶ 231-238 as irrelevant, arguing that Joe and Douglas are not similarly situated to Pechanach and there is no evidence of age discrimination against them. Pechanach has not drawn into question the facts themselves.  Argument on whether Joe and Douglas are similarly situated belongs in her brief, not as a response to proposed findings.

33

May 2001, Quartullo referred to Pechanach as a "tough old broad."  (Pl.'s Obj'ns ¶¶ 347;
PPFOF ¶¶ 27, 28.)  At some time during 2001, a lender told Pechanach that "Cathy
[Quartullo] told me you were a tough old broad and you could handle it."  (DPFOF ¶ 354.)

        In her 2002 self-evaluation, Pechanach wrote:  "I haven't had a review in
years so I'll let you figure out my score . . . basically, I'm all over the board!!  I try but I'm
too old to give it too much energy."  (DPFOF ¶ 341; Ploor Aff. Ex. A at 41-42, Ex. 1
(alteration in original).)  She admits she did so to be funny "and lighten the whole thing up
because I like to keep things light and I like to have fun at my job, and I thought I could just
have some fun."  (DPFOF ¶ 342; Ploor Aff. Ex. at 41-42.)

        In February 2003, Quartullo stated at an RCC managers' meeting that
Pechanach was "older than dirt" and that she was impressed with Pechanach's energy.
(Pl.'s Obj'ns ¶ 347; PPFOF ¶ 30.)  When Quartullo commented about Pechanach's age
at manager meetings, others, such as Dettmann and Susnik, joined in.  (PPFOF ¶¶ 38;
Ploor Aff. Ex. A at 214; Ploor Aff. Ex. F at 39-40, 71-72.)  After one meeting, Pechanach
told Dettmann that she did not need her to chime in regarding the reference to Pechanach
being older than dirt and wanted it to stop.  (PPFOF ¶ 40; Dettmann Dep. at 39.)  Dettmann
noticed that after Pechanach told her to stop chiming in, the age comments about
Pechanach continued.  (PPFOF ¶ 41.)  Pechanach was Quartullo's oldest manager and
Quartullo sometimes referenced that fact at manager meetings.  (PPFOF ¶ 35.)

        Meetings with lenders occurred as part of "meet and greet" sessions between
the lenders and personnel from M&I.  (DPFOF ¶ 348.)  Quartullo called Pechanach "older
than dirt" during at least three meetings or "meet and greets" with bankers or lenders,
visitors or clients.  (DPFOF ¶ 347; Pl.'s Obj'ns ¶ 347; PPFOF 36; Def.'s Resp. ¶ 36.)  Mau

34

was present when Quartullo called Pechanach "older than dirt" and "tough old broad" in front of M&I bank lenders. (PPFOF ¶ 37.)

On February 12, 2004, Quartullo commented that if she won the lottery she would retire; when Pechanach agreed she would do likewise, Quartullo responded that Pechanach was "old enough and have to have tons of money. You are probably the manager that least needs your job." (PPFOF ¶ 32.) These comments bothered Pechanach; she considered them offensive. (PPFOF ¶ 33.) On April 3, 2004, Quartullo told Pechanach: "For an old gal, you are really quick." (Pl.'s Obj'ns ¶ 347; PPFOF ¶ 34.) On October 21, 2004, Pechanach complained to Makarewicz in Human Resources that Quartullo called her "older than dirt." (PPFOF ¶ 50.)

In spring 2005, Quartullo referred to Pechanach as "older than dirt" at a lunch with M&I lenders. (PPFOF ¶ 52.) When Pechanach had carpal tunnel surgery in spring 2005, Quartullo commented: "You're falling apart. Well, you know what, you're older than dirt. Go figure." (PPFOF ¶ 53.) At one meeting with lenders from a bank that had recently been purchased by M&I, managers around the table introduced themselves and told everyone how long they had been at the bank when Quartullo indicated that Pechanach had been there the longest, adding: "Well, Pechanach is older than dirt, she's been around for forever." (Pl.'s Obj'ns ¶ 350; *see* DPFOF ¶¶ 350, 351.) The last time Pechanach recalls Quartullo referring to her as "older than dirt" was in spring 2005. (DPFOF ¶ 356; Pl.'s Obj'ns ¶ 356.)

Pechanach acknowledges making joking comments about her own age in the workplace, but says they were made in an attempt to defuse comments about her being "older than dirt." (DPFOF ¶ 340; Pl.'s Obj'ns ¶ 340; Ploor Aff. Ex. A at 41-42, 148-49.) At

35

times, Pechanach tried to defuse the "older than dirt" statements by responding with her "pat answer" that she had been with the company since she was twelve years old. (DPFOF ¶ 352; Pl.'s Obj'ns ¶ 352.)

Pechanach was a member of the "Old Bags Club," which was a group of five M&I employees who had been getting together personally for twenty-five or more years; the name was conceived by one of its members. (DPFOF ¶¶ 344, 345.)

In June 2005, Quartullo asked Pechanach if she was planning on retiring soon. (PPFOF ¶ 54.) From June 2005 forward, Quartullo had conversations with Pechanach that would begin with problems in Pechanach's department and continue with Pechanach needing to hire a supervisor for when she retired. (PPFOF ¶ 56.) Quartullo's comments changed from "when you retire" to "when are you going to retire." (PPFOF ¶ 57.)

On July 29, 2005, Pechanach complained to Travia about Quartullo's age-related comments. (PPFOF ¶ 59.) Also, Pechanach felt Quartullo and Mau were setting her up, because they each asked her questions on a topic prohibited by Pechanach's prior performance plan. (PPFOF ¶ 60.)

In November 2005, when Quartullo and Pechanach decided that Pechanach should find a stronger supervisor than she had, Quartullo asked Pechanach if she planned to retire soon; Pechanach told her no. (PPFOF ¶¶ 62-63.) However, in early January 2006, Quartullo told Pechanach that she needed someone who could take over her department when she was gone. (PPFOF ¶ 64.) On February 20, 2006, after Pechanach had hired Evans, Quartullo asked how Evans was working out and Pechanach said "great." (PPFOF ¶ 68.)

36

Pechanach never told Quartullo she was offended by the latter's age-related comments. (DPFOF ¶ 359; Ploor Aff. Ex. A at 150.[28]) Rather, Pechanach cautioned Quartullo by saying: "[B]e careful, you're not that much younger than I am." (DPFOF ¶ 260; Ploor Aff. Ex. A at. 150.)

On or about March 20, 2006, Pechanach filed a charge of age discrimination with the EEOC concerning the termination of her M&I employment. (DPFOF ¶ 362.) In her EEOC intake interview, she said that she was called age derogatory names in 2001, but they were very infrequent. (DPFOF ¶ 363.) Pechanach signed a decision not to file on the comments, stating that they were not frequent enough to show a hostile and offensive work environment. (DPFOF ¶ 364.)

DISCUSSION

The ADEA makes it unlawful for an employer "to discharge any individual or otherwise discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). To prevail under the ADEA, Pechanach must show by a preponderance of the evidence that her age was the but-for cause of M&I's decision to fire her. *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. ___, ___ 129 S. Ct. 2343, 2350-51 (2009).

Pechanach may establish her ADEA claim through either the direct or indirect methods of proof. *Faas v. Sears, Roebuck & Co.*, 532 F.3d 633, 641 (7th Cir. 2008).

> The direct method of proof involves direct evidence, such as near-admissions by the employer, as well as more attenuated

---

[28]Pechanach objects to this proposed finding, saying that *Dettmann* knew Pechanach had told Quartullo to stop making age-related comments, but the proposed finding is based on Pechanach's own testimony, and nothing indicates Dettmann had personal knowledge of whether Pechanach ever said anything to Quartullo. (*See* Ploor Aff. Ex. F at 41.)

37

circumstantial evidence that suggests discrimination albeit through a longer chain of inferences. In contrast, the indirect method of proof involves a certain subset of circumstantial evidence that includes how the employer treats similarly situated employees, and conforms to the prescription of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S. Ct. 1817 (1973).

*Faas*, 532 F.3d at 641 (internal quotation marks and citation omitted).[29]

Pechanach is proceeding under both methods of proof.

A.    Direct Method

Direct evidence of discrimination "essentially requires an admission by the decision-maker that his actions were based on the prohibited animus" or "a convincing mosaic of circumstantial evidence that allows a jury to infer intentional discrimination by the decision-maker." *Jordan v. City of Gary, Ind.*, 396 F.3d 825, 832 (7th Cir. 2005) (internal quotation marks omitted). However, such a mosaic of circumstantial evidence "must point directly to a discriminatory reason for the employer's action." *Id.* (internal quotation marks omitted).

On this record, no reasonable jury could find for Pechanach under the direct evidence test. Notwithstanding numerous comments about Pechanach's age by Quartullo, (who was involved in the options and firing decision and whose critiques of and comments about Pechanach were considered by Makarewicz, Mau and Hogan) Quartullo had been making such comments periodically for five years, with no impact on Pechanach's position. In January and May 2001, Quartullo referred to Pechanach as a "tough old broad" at meetings. In February 2003, Quartullo stated at an RCC managers' meeting that

---

[29]Because a plaintiff may use circumstantial evidence under both methods of proof, the distinction between the two methods can be vague. *Faas*, 532 F.3d at 641. Nevertheless, the courts continue with this framework.

38

Pechanach was "older than dirt" and that she was impressed with Pechanach's energy. Yet Pechanach received "meets expectations" performance reviews and raises; she was neither terminated nor demoted over the next several years. Comments by Quartullo continued. They included her February 2004 statement that Pechanach was old enough to retire and her April 2004 statement that "[f]or an old gal, you are really quick." Nonetheless, Pechanach maintained her job, and received "meets expectations" performance reviews and raises. The long span of time regarding the comments suggests strongly that Quartullo's comments had little to do with any decision to terminate Pechanach.

Pechanach contends that the evidence shows she endured a general atmosphere of age discrimination, approved of by Mau, as he was present for some age-related comments but did nothing about them. She contends that this general atmosphere establishes a mosaic of evidence. However, although Pechanach characterizes these comments as continuous, they were spread sporadically across five years, and the last time Pechanach recalls Quartullo referring to her as "older than dirt" was in spring 2005, almost a year before Pechanach was terminated. Although such comments may be considered more than stray remarks because of their duration and the de facto approval by Mau, no reasonable jury looking at the evidence set forth above would find them frequent or continuous or sufficient to show any relation to Pechanach's termination.

Although Pechanach responded to many of the comments jokingly to diffuse them, at times she raised her age to lighten things up, such as in her self-evaluation or initial banter with Quartullo about retirement. In short, insufficient evidence exists to tie any age-based animus to any employment decision regarding Pechanach. *See, e.g.,*

39

*Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 491 (7th Cir. 2007) (stating that particular remarks can provide an inference of discrimination when made by the decision maker, around the time of the decision, and in reference to the adverse employment action).

Pechanach contends that from June 2005 onward, Quartullo's comments changed from "when you retire" to "when are you going to retire." For instance, from June 2005 forward, Quartullo had conversations with Pechanach that would begin with problems in Pechanach's department and transform into needing to hire a supervisor for when Pechanach retired. And in early January 2006, Quartullo told Pechanach that she needed a supervisor who could take over Pechanach's department when she was gone. Soon afterward, Pechanach hired the younger Evans, who appeared to fit the bill, and Pechanach was fired shortly thereafter. Nevertheless, no reasonable jury could find this to be sufficient direct evidence or a convincing mosaic of a discriminatory animus on Quartullo's or M&I's part that factored into the termination decision. Employees retire, and managers can be concerned with continuity of operations in the event of a retirement (or vacation or extended medical absence) without violating the ADEA each time. When Pechanach returned from medical leave, Quartullo commented that she did not like running Pechanach's department when Pechanach was gone. The link between retirement-related comments and Pechanach's termination is just too weak. More importantly, Pechanach attributes no age-based animus or retirement or age-based comments to Hogan, who reacted badly to the Pechanach/Susnik e-mail and began the chain of events leading toward Pechanach's termination, or Makarewicz, who made the final decision to terminate Pechanach. Again, Pechanach has failed to provide under the direct method sufficient

40

evidence of any tie between any age-based comments or considerations on Quartullo's part and M&I's employment decision.

B.    Indirect Method

To establish a prima facie case of age discrimination under the indirect, burden-shifting method of *McDonnell Douglas*, Pechanach first must establish a prima facie case, and prove that "(1) she is a member of a protected class; (2) her performance met [M&I]'s legitimate expectations; (3) despite her performance, she was subject to an adverse employment action; and (4) [M&I] treated similarly situated employees outside of her protected class more favorably." *Faas*, 532 F.3d at 641. If she establishes a prima facie case, the burden of production shifts to M&I to show a legitimate, nondiscriminatory reason for its employment action. *See id.* at 641-42. If M&I meets its burden, Pechanach must show that M&I's proffered reasons are mere pretext for discrimination. *See id.* at 642. "Pretext 'means a dishonest explanation, a lie rather than an oddity or an error.'" *Hague v. Thompson Distribution Co.*, 436 F.3d 816, 823 (7th Cir. 2006), *quoted in Faas*, 532 F.3d at 642. Pechanach must show that a discriminatory reason more likely motivated her termination or that M&I's explanation is unworthy of credence. *Senske v. Sybase, Inc.*, 588 F.3d 501, 507 (7th Cir. 2009); *Faas*, 532 F.3d at 642. The "'pretext inquiry focuses on whether the employer's stated reason was honest, not whether it was accurate.'" *Mills v. Health Care Serv. Corp.*, 171 F.3d 450, 458 (7th Cir. 1999) (quoting *Helland v. S. Bend Cmty. Sch. Corp.*, 93 F.3d 327, 330 (7th Cir. 1996)).

M&I admits that Pechanach meets the first prong of the prima facie case; she is a member of the class protected by the ADEA. However, it attacks the three remaining prongs. The court will take the other elements out of order.

41

For purposes of assessing whether an adverse employment action occurred, M&I separates the four options from Pechanach's termination. It argues that no adverse employment action actionable under the ADEA occurred at the time the four options were given, as nothing changed in Pechanach's employment then; next it looks at the termination in large part from the standpoint of Pechanach's insubordination and failure to show up for work in March 2006. To demonstrate an adverse employment event, Pechanach maintains that the four options amounted to constructive discharge.

The court will not be led down a path that separates the four options from the termination; they will be considered as one event. M&I cannot avoid ADEA liability merely by separating the employment options from the termination. Assuming for the moment that M&I presented Pechanach with the first three options because it wanted to get rid of her because of her age, M&I cannot be allowed to avoid ADEA liability by labeling as insubordination an employee's failure to choose among options each of which is improperly based on age-related animus. Taking the facts in Pechanach's favor, she was offered: (1) a performance improvement plan which was required by M&I policy before termination without knowing the terms of the plan, (2) termination with severance and a chance to look for another job at M&I, or (3) termination with severance with no other option at M&I. The court notes that at the time of this offer Makarewicz did not expect Pechanach to complete the performance plan successfully. M&I added option (4), demotion, nine days later. Then it in essence added option (5): termination with no severance. That some of these choices were outstanding for two weeks does not make them separate from the termination or require the court to look at them separately in determining whether Pechanach was subject to an adverse employment action.

42

It is undisputed that Pechanach was terminated, and termination is a recognized adverse employment action. M&I says it terminated Pechanach for insubordination for not taking one of the first four options and argues that the options were legitimately offered. Those are M&I's proffered legitimate reason for firing Pechanach, not a basis for finding that the options were separate from the termination.

Further, Pechanach has presented sufficient evidence that M&I treated one younger, similarly situated employee more favorably than it treated her. A similarly situated employee is one who deals with the same supervisor, is subject to the same standards, and has "engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Fane v. Locke Reynolds, LLP*, 480 F.3d 534, 540 (7th Cir. 2007).

Dettmann was not similarly situated to Pechanach. Dettmann's job was eliminated. Although M&I created a position for her, but not for Pechanach, the evidence does not indicate that M&I found her performance unacceptable or was looking to move her due to performance concerns. Moreover, there is no evidence indicating Dettmann would have been moved had her job not disappeared. Because Dettmann's job was eliminated and she was not in danger of losing her job due to performance issues, she cannot be considered similarly situated to Pechanach. Whether Pechanach wanted the new job or would have been better at it or more deserving of it is immaterial. The new position was created to retain an acceptable employee whose job had been eliminated.

Micale's situation was closer to Pechanach's, but not close enough to get Pechanach to trial. Micale was the Credit Operations Department Manager at the Brookfield RCC and was placed into a new Compliance Manager position—a lateral

43

move—directed by Mau and Quartullo. Problems with Micale's work are in the record. Quartullo or Mau later told Dettmann that they were concerned with Micale's management style and that if had she not been removed as a manager there was a likelihood of her being terminated. Further, prior to Micale's move, Quartullo had asked Pechanach to work with Micale to make her a better manager because an employee had complained that she had made an inappropriate comment regarding foreigners. Thus, Micale had serious performance issues, yet M&I moved her to a lateral position rather than terminate her.

Significantly, M&I did not create the lateral position for Micale. The position arose because another employee's responsibilities became too much and the job was split into two parts. Thus the position arose, and M&I picked Micale to fill it, notwithstanding her performance issues. When Pechanach was given her four options and thereafter terminated, there were no lateral positions at the Brookfield RCC. Consequently, Pechanach was not similarly situated to Micale.

Nevertheless, Pechanach has found a similarly situated employee in Susnik. Susnik managed one of the three departments (previously four until Dettmann's position disappeared) under Quartullo, just as Pechanach did. Susnik asked Pechanach to draft and send the February 21 e-mail, and her name appeared at the end of it. A reasonable jury could find that she was as culpable for the e-mail as Pechanach. Nevertheless, she was not given options for severance, a performance plan, or demotion. Quartullo appears to have merely spoken with Susnik about it and expressed managements disapproval of the February 21, 2006, e-mail while Pechanach was given unpalatable options and terminated. M&I maintains that Pechanach drafted the language that superior management found objectionable, but Susnik contributed to the e-mail by raising the

concern regarding staff engaging in personal conversations, which management did not believe to be such an issue. Susnik was over ten years younger than Pechanach.

On the other hand, M&I has provided evidence that it treated two employees, Douglas and Joe, who were about nine years younger than Pechanach, similarly to Pechanach when the determination was made that they were not working out as managers or could no longer do their jobs. M&I informed Joe in 2003 that he could either accept a demotion in pay or twenty-four weeks' severance to look for a job outside of M&I. Douglas's manager concluded Douglas lacked the skill set to perform his job in the future, and M&I paid Douglas severance for five months from late 2005 to early 2006. Thereafter, Douglas applied for and was hired into a different M&I job, at the same annual pay as when his employment ended.

The options given to Joe and Douglas sound significantly similar to the options presented to Pechanach in March 2006. However, the existence of some other employees, under different supervisors and management, who were treated similarly to Pechanach does not alter the fact that Susnik can be considered similarly situated for purposes of meeting this element of the prima facie case.

If the court looked only at the period up to January 2006, Pechanach would likely have enough to survive the legitimate expectations prong of the prima facie case. Her 2004 and 2005 reviews, with overall ratings of "Meets Expectations" and fewer "Needs Improvement" than "Exceeds Expectations," establish ability to perform the job at that time. Quartullo told Dettmann that Pechanach was her strongest manager and she told Pechanach that Pechanach was good at managing people and that she loved her reports. There had been a performance improvement plan and a list of challenges, but a

45

reasonable jury looking at the situation through the autumn of 2005 could have found that Pechanach was meeting her employer's requirements

However, the court must look at the situation that transpired between January 1 and March 13, 2006; things changed. And at this point the legitimate expectations prong of the prima facie case converges with the employer's legitimate reasons for the discharge and the pretext analysis. When a plaintiff claims that the employer's assessment of job performance was subject to discrimination, the prima facie case and pretext inquiries may be merged and considered together. *See Senske*, 588 F.3d at 501; *Faas*, 532 F.3d at 642; *Hague*, 436 F.3d at 823 ("[I]f the plaintiffs argue that they have performed satisfactorily and the employer is lying about the business expectations required for the position, the second prong and the pretext question seemingly merge because the issue is the same—whether the employer is lying.").

The undisputed evidence shows that from 2004 through early 2006 M&I was very concerned with customer service and employee morale. M&I had Jarrett review the Brookfield and Appleton RCCs, interview banker-customers, conduct two banker-customer surveys and an employee opinion survey. Apparently, the employee opinion survey was not limited to the Brookfield and Appleton RCCs and showed a firm-wide concern about employee opinion and morale. The results were the basis of a high-level management meeting with seventy-one managers, including Hogan.

The undisputed evidence also shows that the results of the employee opinion survey regarding the Brookfield RCC were significant and generated four focus groups at the Brookfield RCC involving human relations or performance management consultants, as well as a Brookfield RCC managers' action meeting that included a training film. The

46

Brookfield RCC scored poorly compared to M&I as a whole, and no reasonable jury could fail to find that M&I took the results seriously and was looking at improving employee morale at the Brookfield RCC.

Pechanach makes much of the fact that none of the surveys pinpointed her or her department. The banker-customer surveys rated the Brookfield RCC Loan Documentation Department together with its Appleton RCC counterpart. The employee opinion survey rated the Brookfield RCC as a whole, not by department. No Brookfield loan documentation employees at the focus groups named individuals who were problematic.

But Jarrett's review *did* pinpoint Pechanach's department. Jarrett interviewed twenty-five bankers, many of whom expressed concerns about the attitude of the Brookfield RCC documentation staff, thereby causing him to conclude that the relationships between the bankers and the Brookfield RCC documentation staff, i.e., Pechanach's department, was damaged significantly and would be difficult to repair. Jarrett recommended to Mau that the Brookfield RCC documentation department be eliminated and its work taken over by the Appleton RCC. Thus, the record demonstrates that by January 2006, Pechanach's department was under scrutiny as a result of the employee opinion survey, comments by employee focus groups and banker interviews,

Moreover, undisputed evidence shows that by early 2006 upper management wanted to improve relations between managers and employees along with employee morale at the Brookfield RCC. During a January 11, 2006, meeting to consider an action plan dealing with that concern, Pechanach exhibited behavior that did not please upper management. It is undisputed that Schaefer interpreted Pechanach's comments at the

47

January 2006 manager action meeting as shifting blame to employees rather than accepting responsibility for her role in improving employee morale. Schaefer may have misinterpreted Pechanach's comments, Pechanach may have been the only manager to speak, and Quartullo may have been disappointed or angry with all managers who attended the meeting, but Pechanach spoke up and her comments were considered negative and contrary to what M&I was trying to accomplish regarding employee morale. Schaefer passed her observations and conclusions about Pechanach to Quartullo and Hogan.

Shortly thereafter, other reports regarding disharmony between employees or peers and Pechanach came to Quartullo unsolicited. Evans reported that staff told him they distrusted Pechanach and Olson reported that Pechanach had not responded to her.

Then came the February 21 Pechanach/Susnik e-mail. Pechanach and Susnik may have been justified in their concerns about personal conversations, but what upper management reacted to was the tone and language in the e-mail, and it is undisputed that Pechanach wrote it. The e-mail brought to light again Pechanach's management style which was considered to be overbearing, and upper management found that style to be contrary to M&I's current focus on customer service and employee morale.

It is undisputed that Hogan, three levels up from Pechanach and unprompted by Quartullo, reacted badly to the e-mail and thought it was unprofessional, overbearing, and not in the spirit of trying to improve employee morale at the Brookfield RCC. For years, Hogan believed that Pechanach had an overbearing management style and heard of employee complaints about her through Quartullo. But not until reading the e-mail, while M&I was seeking to following Schaefer's report to improve employee morale, did Hogan

48

conclude that action needed to be taken by Mau and Quartullo regarding Pechanach's management style.

Hogan met with Mau on February 24, 2006, and expressed his disappointment with the tone and tenor of Pechanach's e-mail, which he said was not consistent with what M&I was trying to accomplish. Mau shared this conversation with Quartullo and indicated that he agreed with Hogan, and asked that she determine an appropriate course of action. Quartullo thought the e-mail addressed the staff as if they were children, and was inappropriate at a time when M&I was attempting to build better employee teams and wanted employees to feel as though they were working in a collaborative environment.

Pechanach fails to draw into question Hogan's, Mau's and Quartullo's reaction to her e-mail or their truthfulness as to their reactions. Moreover, she does not argue that Hogan or Mau had any age-based bias against her; she attributes age-based bias to Quartullo only. However, it is clear that Hogan and Mau, both superior to Quartullo, found the e-mail inappropriate and contrary to their employee morale goals, and conveyed their opinions to Quartullo. That they may have misunderstood the e-mail, and may have been wrong to overlook or refuse to hear Pechanach's reasons behind it is not evidence of age-based bias.

Any action concerning Pechanach's performance in management was Quartullo's responsibility, as she was Pechanach's direct supervisor. Further, Mau directed her to take appropriate action. In the course of determining how to proceed, Quartullo heard Dexheimer's report that employees continually described Pechanach as intolerant,

49

impatient, abrupt, unapproachable, and aggressive in her management style, and a source of fear and an object of distrust.

No reasonable jury would find Quartullo's statement to Hogan that Pechanach wrote and stood by the February 21, 2006, e-mail which was circulated to her group and Susnik's group as evidence of age-based bias. Notwithstanding that Quartullo had not questioned Pechanach or Susnik about the e-mail, she was correct that Pechanach had written it; she had told Makarewicz she could tell that Pechanach had written the e-mail from the language used. Nor does Pechanach suggest that she did *not* stand behind the e-mail. But even if Quartullo was not truthful on this point in her discussion with Hogan concerning the e-mail, no reasonable jury would find Hogan's conclusion as of late February 2006 that Pechanach should be removed from her management job to be illegitimate or pretextual.

Hogan may not have wanted Pechanach fired, but the decision was Quartullo's and Makarewicz's. In light of Hogan's and Mau's comments, Quartullo understood that a change had to occur. She had received Schaefer's unfavorable assessment of Pechanach's comments and attitude at the focus group, Evans's and Dexheimer's reports of employee complaints, and Olson's complaint.

Further, Quartullo worked with Makarewicz in determining the action that had to or could be taken. At the end of February or in early March 2006, Makarewicz, too, talked with Hogan, who told Makarewicz he did not believe that Pechanach could manage people effectively in the future and that the e-mail was the last straw in Pechanach's management of employees.

50

Under the ADEA, M&I could have fired Pechanach immediately, thereby making discussion of the four options unnecessary. Even so, the options show that M&I's reasons for terminating Pechanach were legitimate and not pretextual. Quartullo and Makarewicz offered Pechanach several options other than outright termination, suggesting they harbored no animus toward Pechanach.

Pechanach suggests pretext from M&I's failure to abide by its policy that a performance plan or written warning had to occur before termination. Although an employer's failure to abide by its own discipline policy may suggest pretext in some cases, *see Rudin v. Lincoln Land Cmty. College*, 420 F.3d 712, 723 (7th Cir. 2005), Pechanach provides no evidence suggesting that M&I was bound to that progression of discipline, *accord, e.g., Fane*, 480 F.3d at 541; *see Kohls v. Beverly Enters. Wis., Inc.*, 259 F.3d 799, 806 (7th Cir. 2001). Moreover, Pechanach has presented no authority establishing that M&I was prevented by its policy from giving an employee an option of quitting with a severance package or taking another position rather than going on a performance plan.

Pechanach also points out a performance improvement plan has not been drafted as of March 2006, any terms were vague, and that Makarewicz told her that she did not expect Pechanach to succeed on any plan. But any inference of pretext regarding use of a plan as a cover dissipates in the face of the directives from Hogan and Mau that a change had to occur and that Pechanach needed to be removed from her management position. Quartullo's option of putting Pechanach on a performance improvement plan would have given Pechanach more than Hogan and Mau had directed—she would have kept her management job for at least some additional time period.

51

On these facts, no reasonable jury would find that Pechanach was meeting her employer's legitimate expectations or that M&I's reasons for offering her the four options, which led to termination when she chose none of them, were pretextual. This court's role is not to second-guess personnel decisions; this court is to determine whether the employer's reasons for taking the employment action were legitimate. M&I may have made a bad decision in terminating Pechanach, but its actions have not been shown to be pretextual.

CONCLUSION

For the above-stated reasons, summary judgment must be granted dismissing Pechanach's ADEA claim relating to her four options and discharge. Further, Pechanach failed to respond to M&I's challenge to any harassment claim she might be making, in effect conceding that any such claim must be dismissed as well. Therefore,

IT IS ORDERED that M&I's motion for summary judgment (Doc. 21) is granted and that this case be dismissed.

Dated at Milwaukee, Wisconsin, this 24th day of March, 2010.

BY THE COURT

/s/ C. N. Clevert, Jr.
C. N. CLEVERT, JR.
CHIEF U. S. DISTRICT JUDGE

52